FILED

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

00 MAR -7  P. !:: 21

U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |  |
|---|---|---|
| HELEN DENISE SIMS, | } |  |
|  | } |  |
| Plaintiff, | } |  |
|  | } |  |
| v. | } | CASE NO. CV 98-B-1518-NW |
|  | } |  |
| REYNOLDS METALS COMPANY; | } |  |
| CHARLES MOORE, | } |  |
|  | } |  |
| Defendants. | } |  |

ENTERED

MAR - 7 2000

## MEMORANDUM OPINION

This case is before the court on defendant Reynolds Metals Company's ("defendant" or

"Reynolds") Motion For Summary Judgment.  Plaintiff Denise Sims ("plaintiff" or "Sims")

brought this action against Reynolds alleging sexual harassment and retaliation under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended, with claims under Alabama

state law alleging outrage, assault, and negligent training and supervision.  Plaintiff brought

Alabama state law outrage and assault claims against Charles Moore individually, with those

claims being dismissed with prejudice on July 27, 1999, in accordance with a Pro Tanto

Stipulation of Dismissal.

Upon consideration of the parties' briefs, evidentiary submissions, oral argument, and the

relevant law, the court is of the opinion that Reynolds's motion is due to be granted.

## I. FACTS

**A.    Parties and witnesses**

Reynolds employed plaintiff as a Reclamation Operator in the Dross House Department,

working the 4:00 p.m. - midnight shift.  (Sims Dep. at 42, 45, 48, attached as Exhibit A to Def.'s

30

Evid. Sub.)  Danny Herston ("Herston") regularly supervised plaintiff, although he was sometimes replaced by Sam Hillman ("Hillman"), the rotating foreman.  *(Id.* at 46-8.)  The next level of supervision was Department Manager Jimmy Ramsey ("Ramsey").  *(Id.* at 47.)  Charles Moore ("Moore") worked the 8:00 a.m.- 4:00 p.m. shift.  *(Id.* at 52.)

## B.      The Locker-Room Incident

According to plaintiff, in the summer of 1996, Moore asked another co-worker named Barry Wiley ("Wiley") if he was sleeping with Sims.  *(Id.* at 212, 219-20.)  Wiley told plaintiff about Moore's question, and plaintiff then followed Moore into the locker area at a shift change:

> I see Charles Moore walking in.  I wanted to get away so that we
> could really have like one-on-one conversation, and everybody else
> could hear about it, so I follow him into the locker room.

*(Id.* at 218.)

Plaintiff confronted Moore, who denied making the statement.  *(Id.* at 228-29.)  She told him she believed Wiley.  *(Id.* at 229).  Moore replied "you are f**ing him."  *(Id.* at 229.)  She told Moore "that who I slept with is my personal business."  *(Id.* at 230.)  According to plaintiff, "the cursing started," with Moore pointing his finger at her face and her pointing her finger at his face.  *(Id.* at 230-31.)  She agrees she was using the same curse words Moore was using, *(Id.* at 234), and that "I might have used the statement that he was mad because I wasn't f**ing him."  *(Id.* at 233.)

Moore asked her to stop pointing her finger at his face.  *(Id.)*  Plaintiff responded that "you're pointing yours in mine."  *(Id.)*  She attempted to "smack" Moore's hand away, and then he pushed her into the lockers.  *(Id.* at 234-35.)  She says Moore "balled his fist up like he was going to hit me, and I kind of slid to my left and went out of door number one."  *(Id.* at 236.)

2

Plaintiff told Sam Hillman (the rotating foreman) what had happened. (*Id.* at 135-36.) Hillman told her that if she wanted to go further with it she could. (*Id.* 244-45.) Plaintiff responded that if "Charles was willing to forget it and drop it and not bother me any more then I would just let it go, too." (*Id.*)

## C.   The Lewd Drawing

The second incident about which plaintiff complains occurred a few weeks later in the summer of 1996. (*Id.* at 253.) Someone drew a picture on plexiglass, with the progression being first a drawing of a female's head, then anatomical parts being drawn, and then plaintiff's name being written. (*Id.* at 254.) After its completion, the drawing remained on the plexiglass for the rest of the shift and the next morning. (*Id.* at 269.) Plaintiff did not see Moore draw any of the picture, but assumes he was the responsible person. (*Id.* at 265-66.)

Plaintiff reported the drawing to Hillman, who told her he would make Moore clean it off. (*Id.* at 271-72.) Hillman further said he "wasn't going to keep putting up with this type of stuff between me and Charles, that if it kept up that he would go to his supervisor about it" and that "he didn't want to be in the middle of it." (*Id.* at 273.) After the picture was erased, she never saw any other picture at Reynolds with her name written on it. (*Id.* at 274-75.)

## D.   The Bicycle Incident

From the second incident in the Summer of 1996 until November 1997, nothing occurred between plaintiff and Moore. According to plaintiff, during that period Moore neither said or did anything to her, (*Id.* at 282), and no one told her that Moore said anything about her or did anything against her, (*Id.* at 283).

3

On November 21, 1997, plaintiff rode a bicycle to the Dross House, parked it, and went into the breakroom.[1] Plaintiff claimed the bicycle as hers, but admits that "it belonged to Reynolds. It was Reynolds's property." (*Id.* at 61.) According to plaintiff, co-worker James Bond "comes in and tells me that Charles Moore was getting ready to ride my bicycle out . . . . I said, no, he wasn't. And he said, yes, he is. And I got up and went out to see for myself." (*Id.* at 79, 80.)

Plaintiff walked outside and saw Moore and co-worker David Hipps ("Hipps") arguing. (*Id.* at 81.) According to Hipps, he was asking Moore if he knew who was greasing the bicycles. (Hipps Dep. at 21-22, attached to Def.'s Evid. Sub. as Exhibit D.) Hipps testified that "I think Mr. Moore thought I was accusing him" because Moore was "cussing" him. (*Id.*) Moore called Hipps a "M.F.," and told Hipps to go into the bathroom so Moore could "stomp" his "ass." (*Id.* at 22.)

Moore had two bicycles stacked on top of each other, one of which was the bicycle plaintiff claimed as her own. (Sims. Dep. at 80-81.) She retrieved her bicycle and brought it back to where she had parked it. (*Id.* at 82-83.) She then started back to the breakroom, but Moore cut her off. (*Id.* at 84.) She did not try to walk around him. (*Id.* at 88.) Moore told her "all of the trouble that's in the dross house is your fault," to which she replied "man, what are you tripping on?" (*Id.* at 85.) "[H]e said, b**h, I hope I catch you outside this m**f**ing plant." (*Id.* at 117.)

---

[1]Plaintiff and several co-workers had bicycles which they rode from the plant gate to the Dross House at the start of their shift and then from the Dross House back to the gate at the end of their shift. (*Id.* at 61-63.)

According to plaintiff, the following and final exchange then took place:

> I stood my ground and said, well, you know what time I get off work. And he said it again, the exact same thing. And I said, well, you know where I live. And I said that the only thing that's wrong with you is that you were mad – you are mad because I wouldn't sleep with you in so many words. And he said – he said, b**h, you probably have a d**k any way. And I said, wouldn't you like to know? And I think that was the end of the argument.

(*Id.*)

During this argument, Sims used her hand in an attempt to stop Moore from pointing his finger at her. (*Id.* at 95.) In the process, Moore "flipped" her on the bottom of her lip for a second with his finger. (*Id.* at 95-97.)

## E.   Reporting the Incidents; Meetings Thereafter

Soon thereafter, the plaintiff complained about this third incident to Shift Supervisor Danny Herston. (*Id.* at 107.) She told Herston that Moore had "assaulted and threatened me." (*Id.* at 109.) She then met with Ramsey and Herston, among others, regarding the incident. (*Id.* at 120-21, 125-26, 146.) During the meeting, plaintiff informed Ramsey and Herston about the two prior incidents with Moore, and that Hillman was aware of those incidents. (*Id.* at 133-35.) Ramsey and Herston said they were not aware of the two prior incidents. (*Id.* at 133-34, 146.)

The next day Hillman spoke with plaintiff regarding the bicycle incident. (*Id.* at 156-60.) During the conversation, he told plaintiff that "it was a bad time for something like this to happen as far as publicity for the company with the possible sale to Alcoa." (*Id.* at 159-60.) Hillman also told plaintiff that Moore was "scared to death." (*Id.*)

According to plaintiff, Hillman said that Moore "was in the office and that he was going to bring him out, and the three of us would talk, and that maybe we could just work it out, you

5

know, with the three of us conversating (sic) it that maybe we could just come to an agreement or whatever and just end it all." (*Id.* at 162.) She said "that I had no guarantee that Charles was going to stop because of the first two incidents," (*Id.* at 171), to which Hillman replied "well, you know he has a bad mind." (*Id.*)

When Moore was brought out to join them, Hillman said "[i]t was a bad time for something like this to happen with this – the possible sale to Alcoa and how it might affect us being hired with them" and that "families would be involved, and it would be in the papers, and just all that kind of stuff." (*Id.* at 166-167.) Moore apologized to her and asked her if she would "drop it." (*Id.* at 170.) Hillman "asked me would I drop it, or I can't remember the exact words he used, but he asked again, are you sure this is what you want to do, or are you sure you want to go forward with this? And I told him that I had no other choice, that I have to because there was no guaranteeing that he was going to stop." (*Id.* at 173-174.)

Plaintiff then returned to the breakroom. While in there, Hillman came in and told her and other employees that he had been ordered to confiscate the bicycles. (*Id.* at 176.) Hillman added "that if he loses his job because of this – I assume he was talking about the bicycle situation, that he wasn't going by himself, that he was taking us with him." (*Id.*)

Later that day, Hillman asked plaintiff whether she was sure she wanted to proceed with this, and she told him "that I really hadn't decided then, that I needed to talk to some people. I hadn't even spoken to my family or anyone about what to do about it. And he was saying that . . . I needed to talk to some more people before I decided what I was going to do or how I was going to handle it." (*Id.* at 179.)

6

Hillman told plaintiff that he needed a decision "before he went home because they were waiting, his superiors were waiting." (*Id.* at 181-82.) She told Hillman that "I couldn't make a decision at that point, that I hadn't spoken to anybody" and that she "would probably seek legal advice." (*Id.* at 183.) Later during the shift, Hillman again asked her "had I made a decision, and I told him, no, that I hadn't spoken to my family yet." (*Id.* at 184.) He gave her his home phone number and told her that if she changed her mind to call him at home. (*Id.* at 186.)

Plaintiff then spoke with a union steward who told her that the union could not get involved because Moore was also a union member and she should get advice from an attorney before she did anything. (*Id.* at 190-91.) She called Hillman that night around midnight and told him that she had not made a decision but that she had spoken to the union steward and he advised her to speak to a lawyer. (*Id.* at 201.)

Hillman met her at the start of the 4:00 p.m. - midnight shift the next day and asked her if she had made a decision yet. (*Id.* at 285-86.) She told him no, that she had not had a chance to speak to an attorney. (*Id.* at 286.) That was the only conversation they had that day. (*Id.* at 288.)

On the following day she met with Danny Herston, Jerry Thompson ("Thompson"), Jimmy Ramsey, and a union steward. (*Id.* at 289-90.) Ramsey said that Reynolds was not going to tolerate this type of behavior, that they all had to work together, and that four people stood a chance of losing their jobs and their families would be involved. (*Id.* at 292.) It was her opinion that the four people who stood to lose their jobs would be her, Charles Moore, Barry Wiley, and David Hipps. (*Id.* at 395.)

Ramsey further said that they all had to work together, that the situation between plaintiff and Moore needed to be settled, and that Reynolds was not going to do anything about it again.

7

(*Id.* at 295.)  She started crying and told them that she had spoken with an attorney and that he advised her not to say anything, but that she had not done anything to Charles Moore and she felt she should not have to take abuse from him.  (*Id.* at 295-297.)

After the meeting, she waited in another office with the union steward while Ramsey, Thompson, and Herston met with Wiley and Hipps.  (*Id.* at 297-300.)  Then Ramsey and Herston came into the office where she was waiting and asked, "if Charles Moore apologizes again would I let it go?"  (*Id.* at 299-300.)  She did not say anything and just got up and walked out.  (*Id.*)  She told Herston she was not feeling well and was going home and, after checking out through the Medical Department, she left.  (*Id.* at 302-303.)

On returning to work the next day plaintiff checked back in through the Medical Department.  (*Id.* at 313-314, 317-318.)  She told the company doctor, Dr. Jon Sherrod, what had happened.  (*Id.* at 377.)  Dr. Sherrod asked her if she had spoken with anyone in Human Resources and gave her the name of the person to contact.  (*Id.* at 378-379.)  Plaintiff responded that "no, that I had not, that I was following my lawyer's advice."  (*Id.* at 379.)

**F.      Further Contact with Moore**

Moore neither touched her nor attempted to touch her after the bicycle incident on November 21, 1997.  (*Id.* at 154.)  She had no conversation with Moore after that incident, other than the conversation she had with Hillman and Moore immediately after the incident.  (*Id.* at 153-154.)  Plaintiff testified that Moore should have been disciplined, but has no opinion as to what that discipline should have been.  (*Id.* at 376.)

8

**G.     EEOC Charge**

She filed her EEOC charge on December 9, 1997, alleging sex discrimination and retaliation. (Pl.'s EEOC Charge, attached as Exhibit B to Def.'s Evid. Sub.)

**H.     Plaintiff's Lay-off**

Reynolds laid off plaintiff in a reduction-in-force in January 1998. (Sims. Dep. at 320-21.) Plaintiff testified, however, that she was not laid off because of her complaints about Moore. (Sims. Dep. at 321.) Her retaliation claim instead is that she was pressured to drop her complaint about Moore. (*Id.* at 337-338, 384-385.)

**I.     Plaintiff's Other Harassment-Related Complaints**

Plaintiff states that in the Dross House, male employees had pornographic "magazines laying around sometimes tucked away." (*Id.* at 280.) She says they were "in desk drawers or underneath seats" and she "can't say who they belong to." (*Id.*) She has never seen Moore with any of them. (*Id.*)

Plaintiff also complains about two circles drawn on Moore's locker with an earplug stuck in the center of each one meant to represent breasts. (*Id.* at 276-78; Def.'s Ex. 7 to Sims Dep., attached as Ex. B to Def.'s Evid. Sub.) She did not see Moore draw the circles or stick on the earplugs. (Sims Dep. at 276-78.)

## II. DISCUSSION

**A.     Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).  The party asking for summary judgment bears the initial burden of

showing that no genuine issues exist.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th

Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party

has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and

show that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.  A dispute is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of

inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be

believed and all justifiable inferences are to be drawn in his favor.  *See id.* at 255.  Nevertheless,

the nonmovant need not be given the benefit of every inference but only of every *reasonable*

inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**B.      Sexual Harassment Claim**

To establish a claim of sexual harassment by a co-worker, plaintiff must show (1) that she

belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the

harassment complained of was based on sex; (4) that the harassment complained of affected a

term, condition, or privilege of employment; and (5) that the defendant knew or should have

known of the harassment in question and failed to take prompt remedial action.  *Henson v. City

of Dundee*, 682 F. 2d 897, 903-05 (11th Cir. 1982).

In this case, defendant contends that (1) the first two incidents about which plaintiff complains (the locker-room incident and the lewd drawing) are time-barred by Title VII's limitations provision; (2) there is not sufficient evidence to show that the locker-room and bicycle incidents were based on plaintiff's gender; and (3) even if the court considers all incidents, there is still not sufficient evidence to show that the actions altered the terms and conditions of plaintiff's employment.  The court agrees.

### 1.    *Statute of Limitations*

According to plaintiff's testimony, the locker room incident and the incident involving the picture on the plexiglass took place in the summer of 1996.  Plaintiff filed her EEOC charge on December 9, 1997, more than 180 days from the summer of 1996.  Therefore, the locker room incident and the incident involving the picture on the plexiglass are barred by the applicable statute of limitations. *Welty v. S. F. & G., Inc.*, 605 F. Supp. 1548, 1553 (N.D. Ala. 1985) (holding that "the requirement that an EEOC charge be timely filed . . . is a condition precedent to the maintenance of an action and that plaintiff bears the burden of demonstrating that the condition precedent has been satisfied.").

Plaintiff cannot use the continuing violation doctrine to avoid the 180-day time limit.  In the Eleventh Circuit, "[i]t is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the limitations period." *Roberts v. Gadsden Memorial Hospital*, 835 F. 2d 793, 800 (11th Cir. 1988), *modified on rehearing*, 850 F. 2d 1549 (11th Cir. 1988).  "The identity of the parties to the discrimination is not sufficient to invoke the continuing violation

11

doctrine. To hold otherwise would render meaningless the 180-day filing requirement of the statute." *Roberts*, 835 F. 2d at 801.

In this case, the only nexus between the summer 1996 events and the November 1997 event is Charles Moore. More than a year passed between the summer 1996 incidents and the November 1997 incident without any problem between them. (Sims. Dep. at 282-283.) *Garrison v. Burke*, 165 F. 3d 565, 570 (7th Cir. 1999) ("the fact that two years passed during which Burke did not harass Garrison demonstrates that Burke's actions were not a continuing violation but rather 'merely discrete, isolated, and completed acts which must be regarded as individual violations'").

Consequently, the court is of the opinion that no nexus exists between the 1996 and 1997 incidents, and therefore the locker-room incident and the lewd-drawing incident are barred by the applicable statute of limitations.

### 2. *Based on Sex*

"In proving a claim for hostile work environment due to sexual harassment, . . . the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). "We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 80 (1998).

In this case, plaintiff has failed to show that Moore's expressions of animosity towards the plaintiff was because of her gender. The most that could be argued is that Moore's expletives included sexual terms. Plaintiff admits, however, that in the bicycle incident she initiated the use

12

of such sexual terms by telling Moore that "you are mad because I wouldn't sleep with you." (Sims Dep. at 117.)  Furthermore, the bicycle incident involved not only plaintiff, but male employees as well.  For example, David Hipps testified that Moore called him a "M.F." and invited him to the men's room to "stomp" his "ass."  (Hipps Dep. at 21-22.)  It is therefore undisputed that Moore's actions were not directed only toward members of the female sex.

Plaintiff has failed to show that Moore's conduct in the summer 1996, locker room incident and the 1997 bicycle incident meet the "because of sex" requirement. *Weinsheimer v. Rockwell International Corp.*, 754 F. Supp. 1559, 1564 (M.D. Fla. 1990), *aff'd mem.*, 949 F. 2d 1162 (11th Cir. 1991) (the employees "engaged in frequent and heated fights, in which each party was equally proficient in their use of crude language").  Consequently, the court is of the opinion that both the locker-room and the bicycle incidents fail to meet the requirement that the alleged harassment be "based on sex," and plaintiff has thus failed to establish a prima facie case of harassment based on those two incidents.

### 3.    *"Severe or Pervasive"*

To reach the level of actionable hostile environment harassment, the conduct alleged must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986).

#### a.    The Locker Room Incident

According to plaintiff, she followed Moore into the locker room "so that we could really have like one-on-one conversation, and everybody else could hear about it." (Sims Dep. at 218.) Plaintiff was attempting to "smack" his hand away when he pushed her. (Sims Dep. at 234-235.)

13

Plaintiff admits that she matched Moore's alleged cursing and finger-pointing word for word. (*Id.* at 234). In other words, the plaintiff initiated the confrontation with Moore and gave as good as she took. Consequently, the court is of the opinion that the locker-room incident was not severe and pervasive enough to alter the terms and conditions of plaintiff's employment.

### b. The Bicycle Incident

It is undisputed that plaintiff's and Moore's argument over a bicycle escalated into mutual cursing and finger-pointing. Plaintiff admits she engaged in finger-pointing and used the same words as Moore with the exception of the word "b**h." (Sims Dep. at 87-88.) The court is of the opinion that Moore's use of that word among a plethora of expletives both she and Moore used does not rise to the level of objective sexual harassment. *See, e.g., Galloway v. General Motors Service Parts*, 78 F. 3d 1164, 1168 (7th Cir. 1996) ("The repetition of the term ['sick b**h'] together with the other verbal conduct that is alleged reflected and exacerbated a personal animosity arising out of a failed relationship rather than anything to do with a belief by [the alleged harasser] . . . that women do not belong in the work force or are not entitled to equal treatment with male employees."). Consequently, the court is of the opinion that the bicycle incident was not severe and pervasive enough to alter the terms and conditions of plaintiff's employment.

### c. The Lewd Drawing

As to the lewd drawing, plaintiff admits that it was the only picture directed toward her, and that she did not actually see Moore write her name on it or draw it. (Sims Dep. at 256-266.) Consequently, the court is of the opinion that plaintiff's exposure to the one drawing was not severe and pervasive enough to alter the terms and conditions of her employment.

### d.    Pornographic Magazines and the Drawing on Moore's Locker

Similarly, the allegations of pornographic magazines and the drawing of "breasts" on Moore's locker do not rise to the level of actionable sexual harassment.

### e.    Conclusion

Even if the court were consider all of the above incidents collectively, including those that are time-barred, they were not severe and pervasive enough to alter the terms and conditions of plaintiff's employment. *See Shepherd v. Comptroller of Public Accounts of Texas*, 168 F. 3d 871, 872-75 (5th Cir. 1999) (holding that several incidents over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support a hostile-environment claim).

Furthermore, the time span of more than a year between the first two incidents in the summer of 1996 and the bicycle incident in November 1997 confirms that there was no objectively severe and pervasive environment. *Mendoza v. Borden, Inc.*,195 F. 3d 1238, 1249 (11th Cir. 1999) ("These instances occurred over an eleventh-month period and therefore were far too infrequent to alter the conditions under which Mendoza was required to perform her job.").

### 4.    *Conclusion*

Based on the above analysis, the court is of the opinion that plaintiff's claim of sexual harassment is due to be dismissed.

15

**C.    Retaliation Claim**

In order to prove a *prima facie* case of retaliation, plaintiff must establish that "(1) she engaged in protected activity; (2) her employer was aware of that activity; (3) she suffered adverse employment action; and (4) there was a causal link between her protected activity and the adverse employment action." *Maniccia v. Brown*, 171 F. 3d 1364, 1369 (11th Cir. 1999).

*1.    Protected Activity*

In this case, plaintiff fails to establish that she complained to Reynolds about "sexual harassment" or any other type of discrimination when she complained to management about the bicycle incident or the locker room incident.  The extent of plaintiff's complaint to management about the bicycle incident was that she told Danny Herston, her supervisor, that Moore "assaulted me and threatened me." (Sims Dep. at 109.)  Furthermore, as explained above, the complained-of incidents were not "because of sex."  Therefore, the defendant could not be expected to infer that plaintiff was complaining about sexual harassment.  Consequently, the court is of the opinion that as to the bicycle and locker-room incidents, plaintiff has not shown that she engaged in protected activity, and therefore has failed to establish a *prima facie* case of retaliation.

*2.    Adverse Employment Action*

Assuming, *arguendo*, that plaintiff engaged in protected activity, she cannot satisfy the prerequisite of an "adverse employment action."  She contends that the alleged retaliation consisted of (a) Hillman "pressuring" her to drop her complaint, (b) Ramsey saying that four people stood to lose their jobs, and (c) Reynolds allegedly saying it was not going to do anything about her complaint.  (Sims Dep. at 337-338, 384-385.)

16

While retaliation need not result in an ultimate employment action, "we do not doubt that there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause." *Wideman v. Wal-Mart Stores*, 141 F. 3d 1453, 1456 (11th Cir. 1998);[3] *cf. Doe v. DeKalb County School District*, 145 F. 3d 1441, 1453 (11th Cir. 1998) ("Any adversity must be material.").

In this cases, the alleged adverse actions fail to meet the threshold level of substantiality. Nothing ever came of Hillman "pressuring" her to drop her complaint or of Ramsey saying four people could lose their jobs over the bicycle incident. *See Robinson v. Truman College*, 1999 WL 33887, at *6 n.12 (N. D. Ill. 1999) ("In any event, this 'threat' [to reduce her work hours] never materialized before Robinson's termination and so, it can hardly be argued that Patterson's alleged harassment 'culminated' in anything 'tangible.'") (discussing tangible employment actions in the context of a harassment claim).

Further, plaintiff's subjective perception that defendant did nothing about her complaint concerning the bicycle incident fares no better. *Doe*, 145 F. 3d at 1448-1449 (adopting an objective test to determine whether an adverse action is actionable). Even if it were true that Reynolds took no action – an assumption which would require disregarding the investigation it conducted – the alleged failure to act resulted in no material adversity to plaintiff. *Perryman v. West*, 949 F. Supp. 815, 819 (M.D. Ala. 1996) ("an employment action . . . is not adverse merely

---

[3]In *Wideman,* the alleged adverse actions that satisfied the threshold level of "substantiality" included the employer or its agents requiring plaintiff to work on her day off, suspending her one day, threatening her with being shot in the head, and needlessly delaying authorization for medical treatment. 141 F.3d at 1455.

because the employee dislikes it or disagrees with it").  It is undisputed that since the bicycle argument, Moore has done absolutely nothing to her.  (Sims Dep. at 153-154.)

Consequently, the court is of the opinion that plaintiff has failed to establish that she suffered an "adverse employment action," and therefore has failed to establish a *prima facie* case of retaliation.

### 3.    *Causal Link*

Assuming the locker room incident or the lewd drawing was because of sex and plaintiff reporting them was protected activity, her retaliation claim still fails.  According to plaintiff, she complained to Hillman about the two incidents when they occurred in the summer of 1996.  However, the alleged retaliation did not take place until more than a year later, in November 1997.  Such a lapse in time between engaging in the protected activity and any alleged adverse employment action precludes a reasonable inference of causation.  *Maniccia v. Brown*, 171 F. 3d 1369, 1370 (11th Cir. 1999) ("The more than 15-month period that elapsed between Appellant's grievance and the alleged adverse employment actions belies her assertion that the former caused the latter."); *Conner v. Schnuck Markets, Inc.*, 121 F. 3d 1390, 1395 (10th Cir. 1997) (4-month lag between protected activity and termination not sufficient to justify an inference of causation).  Consequently, the court is of the opinion that plaintiff has failed to link the protected conduct to any adverse employment action, and therefore has failed to establish a prima facie case of retaliation.

18

**D.    State Law Claims**

   *1.    Outrage*

   In order to establish a prima facie case of outrage, a plaintiff must allege activity "so

outrageous in character and so extreme in degree as to go beyond all possible bounds of

decency." *Newton v. Town of Columbia*, 695 So. 2d 1213, 1218 (Ala. 1997).   The court is of the

opinion that nothing plaintiff alleges in this case meets this stringent standard. *Id.* ("while the

conduct alleged in Ms. Newton's affidavit may amount to an assault, or to a violation of her

constitutional rights, it does not follow that the same conduct necessarily constitutes extreme and

outrageous conduct"); *Surrency v. Harbison*, 489 So. 2d 1097, 1105 (Ala. 1986) (no outrage

claim based on conduct much more serious than here).

   *2.    Assault*

   Plaintiff claims that on November 21, 1997, Moore hit her in the face causing injury.

According to plaintiff, she reported this assault to defendant, but defendant chose to do nothing,

thereby ratifying the actions of Moore.   In order to show that defendant ratified Moore's conduct,

plaintiff must show that defendant expressly adopted Moore's conduct or implicitly approved it.

*Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995).  Plaintiff, however,

testified that Ramsey stated that defendant was not going to tolerate this type of behavior and that

they all had to work together.  (*Id.* at 292.)

   Furthermore, plaintiff cannot establish that Reynolds failed to take adequate steps to

remedy the situation.  *Mardis*, 669 So. 2d at 889 ("in addition to proving the underlying tortious

conduct of an offending employee, a complaining employee must show that the employer . . .

failed to take 'adequate' steps to remedy the situation").  All plaintiff claims is that Reynolds did

not take the action she wanted them to take by disciplining Moore, although she has no opinion as to what discipline she wanted Moore to receive. (Sims Dep. at 376.) It is undisputed that Reynolds investigated the incident, including interviewing witnesses, and that after the investigation, Moore never had any contact with plaintiff. (*Id.* at 154.)[4] Consequently, the court is of the opinion that plaintiff failed to establish that defendant either ratified Moore's conduct or failed to take adequate steps to remedy the situation, and therefore plaintiff's claim of assault is due to be dismissed.

### 3.   *Negligent Training and Supervision*

Plaintiff's claims of negligent training and supervision fail for several reasons. First, the bicycle incident was a personal dispute between plaintiff and Moore, in no way furthering their employer's interests. *Birmingham Electric Co. v. Hawkins*, 67 So. 2d 56, 57 (Ala. App. 1953) (altercation was a personal event in which the employer had no interest). The claim is thus precluded by the principle that these causes of action require proof that the offending employee was acting in the line and scope of her employment. *Nash v. Segars*, 682 So. 2d 1364, 1365 (Ala. Civ. App. 1996) ("In order to prevail in a negligent hiring case, a plaintiff must show that an employee was acting within the line and scope of his employment. . . . It is undisputed that [the employee's] criminal conduct at [plaintiff's] house was not within the line and scope of his employment with [defendant].").

---

[4]Since the assault allegation is asserted only as to the bicycle incident, there is no need to consider the locker room incident. Even if it were considered, there would be nothing on which to rest ratification. The plaintiff said with regard to that incident that if "Charles was willing to forget it and drop it and not bother me any more then I would just let it go, too." (Sims Dep. at 244-45.)

Second, to the extent that plaintiff alleges sexual harassment as the predicate act for the negligent training and supervision claims, the claims must fail. It is axiomatic that without some type of tortious conduct, negligent training and supervision claims cannot stand. *Mardis*, 669 So. 2d at 889. Here, plaintiff appears to claim, in part, that the negligent hiring and supervision caused her to be sexually harassed. As explained above, however, there was no actionable sexual harassment. Plaintiff, therefore, having failed to establish actionable sexual harassment, has no predicate act and cannot establish her claims of negligence.

Third, plaintiff's claims rest on the premise that Sam Hillman should have taken action following the locker room incident. (Sims Dep. at 363.) Plaintiff, however, told Hillman that she did not want him to proceed with any action against Moore. (Sims Dep. at 244-245.) She cannot logically argue that Hillman was at fault for complying with her request. *Lane v. Central Bank of Alabama*, 425 So. 2d 1098, 1100 (Ala. 1988) (affirming directed verdict on negligent supervision because plaintiff "simply acquiesced in [the other employee's] allegedly illegal and certainly unethical conduct" precluding plaintiff from "recover[ing] any damages from the [employer]").

Fourth, the mere fact of Moore's alleged assault on November 21, 1997, does not, of itself, establish claims of negligent hiring and/or supervision. While an alleged subsequent wrong is an essential element of the causes of action, it is not evidence of negligent training or supervision. *N.J. v. Greater Emanuel Temple Holiness Church*, 611 So. 2d 1036, 1037 (Ala. 1992) (holding that "the mere fact that an injury occurred is not evidence of negligence and that in negligent supervision cases negligence will not be found by inference").

21

Consequently, the court is of the opinion that plaintiff failed to establish her claims of negligent hiring and/or supervision, and such claims are due to be dismissed.

### III. CONCLUSION

Based on the foregoing, the court finds that defendant's Motion for Summary Judgment is due to be granted.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 7th day of March, 2000.

**SHARON LOVELACE BLACKBURN**
United States District Judge

22